**In re CAJUN ELECTRIC POWER COOPERATIVE, INC.**

Civ.A. Nos. 02–243–B–M2, 94–2763–B–M2.
Bankruptcy No. 94–11474.

United States District Court, M.D. Louisiana.

June 19, 2002.

Karen H. Freese, Noel Joseph Darce, Douglas Deane Dodd, Michael R. Fontham, Stephanie D. Shuler, Paul Zimmering, Stone, Pigman, Walther, Wittmann & Hutchinson LLP, New Orleans, LA, for appellant.

John Joseph Gaupp, United States Attorney's Office, Middle District of Florida, Baton Rouge, LA, R. Patrick Vance, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, Patrick Edgerton Henry, Sharp, Henry, Cerniglia, Colvin, Weaver & Hymel, Shreveport, LA, V. Russell Purvis, Jr., Smith, Taliaferro, Seibert and Purvis, Jonesville, LA, David Samuel Rubin, Kantrow, Spacht, Weaver & Blitzer, Baton Rouge, LA, James Joseph Davidson, III, Davidson, Meaux, Sonnier & McElligott, Lafayette, LA, James B. Supple, Biggs, Supple, Cremaldi & Curet, LLP, Franklin, LA, John M. Sharp, Baton Rouge, LA, for appellees.

William Hardy Patrick, III, Schwab & Walter, Baton Rouge, LA, for debtor.

David Samuel Rubin, Kantrow, Spacht, Weaver & Blitzer, Baton Rouge, LA, for trustee.

## RULING

POLOZOLA, Chief Judge.

This case is once again before this Court on an appeal taken by the Louisiana Public Service Commission (LPSC) from a decision rendered by the bankruptcy judge on December 4, 2001. The bankruptcy judge denied the amended motion of the LPSC for recovery of amounts due at closing and request for stay to prevent depletion of estate assets.

The facts of this case have been set forth many times in prior opinions rendered by the Fifth Circuit Court of Appeals, the bankruptcy court and this Court. They need not be restated again in this opinion.

After carefully reviewing the record in this appeal and for essentially the reasons set forth in the December 4, 2001 opinion of the bankruptcy judge, which is attached hereto as Appendix 1, the decision of the bankruptcy judge is hereby affirmed.

This Court was very involved in negotiating the settlement agreements to which the parties consented. The findings of fact set forth by the bankruptcy judge adequately and correctly set forth the intent of the parties and the meaning of the settlement agreements and the Confirmation Settlement. No further hearings, oral argument or other proceedings are necessary in this case.

This Chapter 11 proceeding has been pending since December 21, 1994. It is now time to put an end to this case and to the continued and needless waste of judicial resources, attorneys' fees and other costs which are incurred with each hearing and appeal. As the bankruptcy judge so concisely and correctly stated in his con-

clusion "no additional funds are due the LPSC pursuant to the Confirmation Settlement." This Court agrees with the bankruptcy judge.

The December 4, 2001 opinion of the bankruptcy judge is affirmed in its entirety.

Judgment shall be entered accordingly.

## APPENDIX 1

### REASONS FOR DECISION

Cajun Electric Power Cooperative, Inc. ("Cajun"), was a non-profit Louisiana electric cooperative corporation which generated and transmitted wholesale electric power principally to its members. On December 21, 1994, the date this chapter 11 case was filed, Cajun was composed of 12 distribution cooperatives[1] ("Members"), each being, like Cajun, a non-profit Louisiana electric cooperative. The Members in turn supplied power to approximately one million individual and commercial customers in rural Louisiana.[2] At all relevant times, Cajun's rates to its Members were regulated by the Louisiana Public Service Commission ("LPSC").

Prior to the chapter 11 filing, Cajun had constructed and invested in electric generating and transmission facilities. These facilities were financed primarily through loans from or guaranteed by the United States of America, acting through the Rural Electrification Administration, which is the predecessor to the Rural Utilities Service ("RUS"). RUS was by far the largest creditor in the case, the debt being approximately $4.2 billion.[3] RUS's claim was secured by a security interest in virtually all of Cajun's assets.

Early in the chapter 11 proceeding, an agreement regarding Cajun's use of cash collateral was negotiated with the RUS and other parties, and a Cash Collateral Order was entered. Pursuant to the Cash Collateral Order, Cajun was permitted to establish a reserve in its operating account of $35 million. On the first day of each month thereafter, all funds in excess of $35 million were swept into a segregated account commonly referred to as the Segregated Funds Account. Except when the balance in the operating account on the first day of a month was less than $35 million, the sweep occurred on a monthly basis for the duration of the bankruptcy proceeding.

In September 1996, the LPSC determined that since Cajun was not paying debt service to the RUS in the chapter 11 case, amounts that should have been paid to the RUS as interest could not be included as expenses in determining Cajun's rates to the Members. In October 1996, the LPSC ordered Cajun to establish an "interest escrow account" into which the Trustee was to deposit sums on a monthly

1. Dixie Electric Membership Corporation, Valley Electric Membership Corporation ("Valley"), Northeast Louisiana Power Cooperative, Inc., Beauregard Electric Cooperative, Inc., South Louisiana Electric Cooperative Association, Washington–St. Tammany Electric Cooperative, Inc. ("WST"), Concordia Electric Cooperative, Inc. ("Concordia"), Jefferson Davis Electric Cooperative, Inc., Claiborne Electric Cooperative, Inc. ("Claiborne"), Pointe Coupee Electric Membership Corporation ("Pointe Coupee"), Southwest Louisiana Electric Membership Corporation, and Teche Electric Cooperative, Inc.

("Teche"). After the Petition Date, Teche was acquired by a for-profit utility, Central Louisiana Electric Company.

2. While Cajun's original mission was to furnish economical and reliable energy to rural customers in Louisiana, Cajun today does have contracts where energy is provided to non-Louisiana users.

3. See RUS Proof of Claim, Docket # 295 filed September 29, 1995.

basis representing the suspended debt service payments. The Trustee established an Interest Escrow Account on October 29, 1996.

Pursuant to a challenge by the Trustee and RUS, this court ruled in April 1998 that the Trustee was not required to maintain the Interest Escrow Account. The Trustee terminated that account and transferred all funds contained therein to the Segregated Funds Account. The District Court affirmed this court's ruling. On August 16, 1999, however, the Fifth Circuit reversed the rulings of this court and the District Court. No mandate was issued by the Fifth Circuit at that time.

On August 25, 1999, at a settlement conference convened by District Judge Frank Polozola, the major parties involved in the Cajun bankruptcy case entered into a Settlement Agreement Relative to Confirmation of Creditors' Plan in Chapter 11 Case of Cajun Electric Power Cooperative, Inc. ("Confirmation Settlement"). The Confirmation Settlement was approved by the District Court on August 26, 1999. A document called the LPSC/RUS/Trustee Term Sheet ("Term Sheet") was attached to and incorporated into the Confirmation Settlement. The Term Sheet settled various disputes among the LPSC, RUS and the Trustee, including the prosecution of rate cases against Cajun, the allocation of the Segregated Funds Account, the implementation of certain rate adjustments and the dismissal of various related lawsuits.

With respect to the allocation of the Segregated Funds Account, the Term Sheet provided that the funds contained therein (approximately $300 million) would be distributed on the effective date of the confirmed plan ("Effective Date"), which was March 31, 2000, with one-third going to the RUS and two-thirds going to the LPSC. Accordingly, on the Effective Date,

the LPSC received in excess of $190 million as its two-thirds share of the Segregated Funds Account, which funds ultimately went through the Members to the consumers.

A dispute arose in September 1999 regarding the interpretation and implementation of certain matters contained in the Term Sheet. To resolve this dispute, Judge Polozola conducted two additional days of settlement negotiations. These negotiations resulted in the negotiated LPSC/RUS Order which was approved on October 14, 1999, and subsequently incorporated into the confirmed plan of reorganization.

The LPSC has now filed an **AMENDED MOTION OF THE LOUISIANA PUBLIC SERVICE COMMISSION FOR RECOVERY OF AMOUNTS DUE AT CLOSING AND REQUEST FOR STAY TO PREVENT DEPLETION OF ESTATE ASSETS** ("LPSC Motion"). On August 3, 2000, the District Court referred this matter to this court. Hearings on the LPSC Motion were held on October 30, 2000, January 11 and 12, 2001 and February 20, 2001.

## I. LAW AND ANALYSIS

The LSPC argues that additional funds should have been placed in the Segregated Funds Account following the Confirmation Settlement and that it is entitled to its two-thirds share of those funds, somewhere in the vicinity of $6 million. The LSPC argues that the Term Sheet and the LSPC/RUS Order required the Trustee to continue to deposit funds which should have been deposited into the Interest Escrow Account (as ordered by the Fifth Circuit) into the Segregated Funds Account until the Effective Date.

The Trustee and RUS, however, take the position that the parties had agreed that the only sweeps which would occur

would be the cash collateral sweeps, that these occurred, and that no further deposits into the Segregated Funds Account are due.

## A. THE SETTLEMENT DOCUMENTS

Both the Term Sheet and the LPSC/RUS Order provide that the "Segregated Funds Account" "shall include the interest escrow account, the Order No. U–17735 Subdocket A escrow account, and the segregated funds under the Cash Collateral Order." The Term Sheet further provided that "[t]he parties agree to jointly request that Appeal No. 98–31258 in the United States Court of Appeals for the Fifth Circuit be dismissed without the issuance of a mandate." Finally, Paragraph 8 of the Term Sheet, as amended by the LPSC/RUS Order provided as follows:

> The Trustee shall continue to abide by the Cash Collateral Order and amounts in excess of $35 million in the general funds account will be swept to the Segregated Funds Account on the first of each month prior to the Effective Date. If the general funds account exceeds $40 million on the Effective Date, then any amounts in excess of $40 million (the "Segregated Excess Funds") shall be paid as follows: One-third of the funds will be transferred to the RUS and two-thirds of the funds will be refunded or otherwise devoted to the benefit of ratepayers as the LPSC directs. The Segregated Receivables and Segregated Excess Funds shall be referred to jointly as "Additional Segregated Funds." Except as set forth in this Order, the

LPSC/RUS Term Sheet, and the Confirmation Settlement, the LPSC has no right, title, claim, or interest in or to any of Cajun's general funds account or any other asset of Cajun's estate.

Ironically, both sides argue that the Term Sheet and LPSC/RUS Order are clear and unambiguous. This court previously held to the contrary, observing:

> The Settlement Agreement is ambiguous in at least the following respects:
>
>> (a) The documents do not define "interest rate escrow account";
>>
>> (b) The documents do not indicate what deposits are to be made into the interest rate escrow account; and
>>
>> (c) At the time the various components of the Settlement Agreement were signed, no such account was in existence.[4]

The LPSC argues that Paragraph 1 of the Term Sheet must be read to mean that deposits into each of the three components of the Segregated Funds Account were to continue to the Effective Date. Paragraph 1 provides in relevant part as follows:

> The parties agree that funds held by Cajun in its Segregated Funds Account (which shall include the interest rate escrow account, the Order No. U–17735 Subdocket A escrow account, and the segregated funds under the Cash Collateral Order) on the Effective Date of the confirmed Plan of Reorganization or the dismissal of the case (other than funds received in exchange of a sale of Cajun's assets) will be divided as follows ...

The LPSC argues that this language must be interpreted to mean that deposits into each of the three accounts mentioned

---

4. Memorandum Ruling on (1) Motion In Limine, Motion for Protective Order, and Motion to Quash Notice of Deposition and Subpoena and (2) In Limine Motion of Ralph R. Mabey, Trustee, to Strike Documents from LPSC's Exhibit List with Respect to the Claim of the Louisiana Public Service Commission for Recovery of Settlement Amounts and Scheduling Order entered on October 10, 2000.

were to continue through the Effective Date.

The court disagrees with this interpretation. The language contained in Paragraph 1 contains absolutely no directive for any deposits to continue. This paragraph merely defines what funds would be considered part of the Segregated Funds Account and provides that whatever funds were in that account on the Effective Date would be subject to a two-thirds/one-third split. Paragraph 1 does not in any respect suggest continuing deposits. Any directive for continuing deposits must be contained elsewhere in the documents.

In fact, the Term Sheet does explicitly provide for continuing deposits. As indicated above, Paragraph 8 of the Term Sheet, as modified by the LPSC/RUS Order required the Trustee to continue to comply with the Cash Collateral Order and sweep amounts in excess of $35 million into the Segregated Funds Account. Neither the Term Sheet nor the LPSC/RUS Order contain any reference to continuing interest escrow deposits. Logic dictates that if the parties had intended to continue requiring deposits into the cash collateral and interest escrow accounts, they would have addressed both rather than specifically addressing one and remaining silent as to the other.

The LPSC contends that Paragraph 7 of the Term Sheet supports its position that continuing interest escrow deposits were required. Paragraph 7 provided that "Cajun shall retain the right to access the funds held in the Segregated Funds Account subject to approval by the Bankruptcy Court, the RUS, and the LPSC." The

LPSC asserts that this language anticipates continued interest escrow amounts as the approval of the LPSC would not be required for Cajun to access funds swept under the Cash Collateral Order. The LPSC argues that Paragraph 7 only makes sense if continued interest escrow deposits were required. Again the court disagrees with the LPSC interpretation. The clear reason for requiring both RUS and LPSC approval for access to those funds was the fact that the parties were agreeing to split the funds. Regardless of the source of the funds, the LPSC, who would be receiving two-thirds of the money, clearly had an interest in the Segregated Funds Account.

## B. EXTRINSIC EVIDENCE

### 1. *Discussions Among the Parties*

During the initial settlement conference, a meeting was held among Frances "Kem" Toole, counsel for the RUS, Larry Belluzzo, the representative of the RUS in attendance at the conference, and LPSC commissioners Jack Blossman, Jr., and Dale Sittig.

Mr. Belluzzo, who is the Program Advisor to the Administrator of the RUS, testified that Commissioners Blossman and Sittig were in agreement that the interest escrow account would not be reestablished. Mr. Belluzzo testified that the parties agreed that the Trustee would simply sweep all moneys in excess of $35 million into the Segregated Funds Account. Mr. Belluzzo further testified that he discussed with the commissioners the possibility that one party might end up with a slight advantage as a result of the one-third/two-third split [5], but that the benefit of a sim-

---

5. It was determined during an earlier mediation that the approximate percentages of interest escrow and cash collateral contained in the Segregated Funds Account at the time was 66% and 33% respectively. Depending on the amounts contained in the operating account at the time of each sweep, the ratio of interest to cash collateral on a monthly basis could differ, favoring one side or the other.

ple solution to the ongoing litigation outweighed the risk of such a possibility.

Ms. Toole corroborated Mr. Belluzzo's testimony. She testified that she and Mr. Belluzzo met with Commissioners Blossman and Sittig and that all agreed that interest would not be escrowed on a going forward basis.

Commissioner Blossman testified that he and Commissioner Sittig did participate in a meeting with Mr. Belluzzo and Ms. Toole outside the presence of their counsel. Beyond that, however, his memory was fuzzy. Commissioner Blossman testified that he had no specific recollection of any discussions regarding interest escrow deposits on a going forward basis. He indicated that if such discussions had been held he believed he would have told his counsel about them, which he did not do. Commissioner Blossman testified that he would have remembered advising Mr. Fontham about such an agreement because it would have resulted in a fight. According to Commissioner Blossman, he and Commissioner Sittig had ideas about how to settle the case which differed from that of their counsel. Commissioner Blossman did remember discussions about sweeping funds in excess of $35 million into the Segregated Funds Account.

Commissioner Sittig did not testify. The parties have spent a significant amount of time arguing about whether a negative inference should be drawn from the LPSC's failure to call Commissioner Sittig as a witness. Regardless of whether the court determines that the failure of the LPSC to call Commissioner Sittig results in a presumption that his testimony would have been unfavorable to the LPSC, the fact is that the preponderance of the testimony presented clearly supports the position of the RUS without addressing the issue of the failure to call Commissioner Sittig. Of the four persons who attended the meeting, two specifically recalled an agreement not to escrow interest on a going forward basis, one did not recall such a discussion but could not say with any certainty that such a conversation did not take place, and the fourth was not called to testify.

Further, the comments by Commissioner Blossman that he and Commissioner Sittig had different views than their counsel about how to settle the case and that a fight with counsel would have resulted if they had discussed not continuing interest escrow deposits, leads the court to believe that the commissioners were in favor of this type of arrangement. In fact, Mr. Belluzzo testified that he had a conversation with Commissioner Sittig when the present dispute arose. According to Mr. Belluzzo, Commissioner Sittig stated that he believed that the position being taken by the LPSC in this litigation was inconsistent with the settlement reached. Once again, Commissioner Sittig was not called to refute this testimony so the court must conclude that Mr. Belluzzo's recollection of the conversation was accurate.

### 2. *Communications Among Counsel*

The LPSC also contends that certain communications between counsel for the LPSC and counsel for the Trustee reflect that the Trustee believed that the settlement required continuing interest escrow deposits.

On August 31, 1999, just days after the entry of the Confirmation Settlement, David Rubin, counsel for the Trustee, contacted Karen Freese, counsel for the LPSC by telephone. During that telephone call, Mr. Rubin requested confirmation that the LPSC did not object to the Trustee leaving all funds in the Segregated Funds Account rather than removing funds representing interest escrow for de-

posit into a separate account. Ms. Freese advised Mr. Rubin that she would have to consult Michael Fontham, lead counsel for the LPSC, and get back with him. Ms. Freese and Noel Darce, also counsel for the LPSC, jointly called Mr. Rubin later that day and advised that the LPSC had no problem with the Trustee maintaining a single account on two conditions, namely that an accounting be kept to indicate the interest escrow funds being collected by Cajun on a monthly basis and also that there would be no effect on the amount being placed in the Segregated Funds Account for interest. Mr. Rubin testified that at this point he expressed surprise that this position was being taken by counsel for the LPSC. Mr. Rubin further testified that either Mr. Darce or Ms. Freese, probably Mr. Darce, stated that they would have to agree to disagree on the issue. Mr. Rubin testified that the call ended with the indication that counsel for the LPSC would write a letter stating their position on the interest escrow issue.

Mr. Darce and Ms. Freese testified that they did not recall the statement that they would have to agree to disagree being made and that Mr. Rubin did not express any disagreement with their stated position.

Following the phone conversation, Mr. Rubin sent a letter to Mr. Darce which stated that:

> This letter confirms our telephone discussion of today. Based upon the Order Approving Settlement Agreement (and the LPSC/RUS/Trustee settlement, which is subject to LPSC approval), Cajun will not be segregating the "interest escrow fund" discussed in the recent opinion of the Fifth Circuit. First, the mandate has yet to be issued. Second, in order to segregate those funds, as we

discussed, will involve cost and expense to Cajun.

> We have agreed to maintain appropriate accounting of the amounts that would have been placed in the interest rate escrow account for tracing purposes. In addition, sweeps into the cash collateral account will continue in accordance with the existing cash collateral order.

LPSC Exhibit 3.

In response, on September 1, 1999, Mr. Fontham wrote a letter to Mr. Rubin stating that:

> In response to your letter of Tuesday, we agree to your request, so long as you understand that all funds that would have been placed in escrow under the interest escrow Order will be placed in the segregated fund, not just funds that accumulate in excess of $35 million.

LPSC Exhibit 5.

Although Mr. Rubin's letter was copied to counsel for RUS, Mr. Fontham's letter was not. There was no further correspondence between the parties.

The LPSC argues that these communications establish that counsel for the Trustee believed that continuing interest escrow deposits were required. The court disagrees. These communications reflect only that *counsel for the LPSC* believed that such deposits were required. Mr. Rubin's letter does not reflect such a belief on his part.

### 3. The M–Order

The LPSC argues that Commissioners Sittig and Blossman could not have bound the LPSC to an agreement different from that adopted by the LPSC after a public vote. The LPSC argues that it's understanding that interest was to be collected in the future is reflected in Order U–17735–M (the "M–Order"), wherein the

LPSC approved the Confirmation Settlement. The LPSC points to Paragraph 2 of the M–Order which states as follows:

*Sharing of Funds.* Two thirds of all funds held by Cajun in its Segregated Funds Account at the close of bankruptcy, including accounts receivable after that date, will be allocated to the Commission for the benefit of ratepayers. These segregated funds represent the interest collected during the bankruptcy and other excess revenues.

LPSC Exhibit 15.

The LPSC argues that this provision clearly indicates its belief that interest escrow deposits would continue through the Effective Date. The court disagrees. The court does not believe that the term "during the bankruptcy" was clearly intended to mean that interest deposits would continue through the Effective Date. In fact, in another provision of the M–Order, the term "post-bankruptcy" appears to mean post-confirmation ("[t]he Commission authorizes a post-bankruptcy proceeding to analyze whether the transfer of Cajun's assets to Louisiana Generating ...").[6] Commissioner Blossman testified that he believed "during the bankruptcy" meant up to confirmation. The court does not believe that Paragraph 2 of the M–Order is inconsistent with a cessation of interest escrow deposits.

#### 4. *Cajun's Actions After the Settlement*

Finally, the LPSC argues that the actions taken by Cajun's employees after the settlement reflect a belief that continuing interest escrow deposits were required. The LPSC cites the testimony of Gary Hall, senior vice president and chief financial officer of Cajun, that he was concerned that interest escrow deposits would be required. However, Mr. Hall immediately followed that statement with the comment that Ms. Toole had made it clear to him that that was not the agreement.

The LPSC also points to certain internal memoranda prepared by Julie Fiant, Cajun's senior financial analyst, following the settlement conference which memoranda report on amounts which would be escrowed. Both Mr. Hall and Ms. Fiant testified that it was not Ms. Fiant's purpose to direct any deposits and, in fact, she had no authority to do so. The memoranda prepared by Ms. Fiant appear to be merely the reporting function promised in Mr. Rubin's letter of August 31, 1999.

### II. MOTION TO STRIKE

Following the submission of post hearing memoranda, the Trustee and RUS filed a Joint Motion to Strike. The Trustee and RUS ask that two exhibits attached to the Post–Hearing Memorandum on Behalf of the Louisiana Public Service Commission ("LPSC Brief"), as well as the portions of the LPSC Brief related to those exhibits be stricken. The two exhibits are a letter from counsel for the RUS to counsel for the LPSC and a portion of the deposition of Mr. Fontham. The two exhibits were not introduced during the hearing and relate solely to the argument as to whether the court should draw a negative inference from the LPSC's failure to call Commissioner Sittig. The LPSC argues that the exhibits should be allowed because the issue of negative inference was not raised until the closing argument of the RUS.

The court will strike the exhibits and any argument related thereto for two reasons. First, the exhibits were not introduced at the hearing. In fact, the deposi-

---

**6.** M–Order at page 7.

tion could not have been introduced as Mr. Fontham testified personally at the hearing and a large part of the excerpt which the LPSC attached as an exhibit would be considered hearsay. Second, and more importantly, the arguments relating to negative inference had no bearing on the court's decision. The court has ruled that it was unnecessary to determine whether a negative inference should be drawn as the weight of the evidence actually presented was contrary to the LPSC's position. As a result of this circumstance, the court need not determine whether it would be appropriate to conclude that Commissioner Sittig's testimony would be harmful to the LPSC's position.

### III. CONCLUSION

The court concludes that the Confirmation Settlement, which incorporated the Term Sheet and the LPSC/RUS Order, cannot be logically read to require ongoing interest escrow deposits. The documents, themselves, are consistent with the interpretation of the RUS and the Trustee. Further, the extrinsic evidence presented reflects a specific agreement not to continue the interest escrow deposits. For these reasons, the court finds that no additional funds are due to the LPSC pursuant to the Confirmation Settlement and the LPSC Motion must be **DENIED.**

In addition, the Joint Motion to Strike is **GRANTED.** The two exhibits attached to the LPSC Brief are stricken. In addition, the two paragraphs starting on page 12 and ending on the top of page 13 of the LPSC Brief are hereby stricken from the record.

Separate orders in conformity with the foregoing reasons has this day been entered into the record of this proceeding.

**THUS DONE AND SIGNED** in Chambers in Opelousas, Louisiana, on this 4th day of December, 2001.

Gerald H. Schiff

United States Bankruptcy Judge